IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Billie Jo Whitfield, | ) | C/A No.: 1:16-3428-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Richard M. Gergel, United States District Judge, dated November 9, 2016, referring this matter for disposition. [ECF No. 9]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 8].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.      Relevant Background

A.      Procedural History

On January 22, 2013, Plaintiff filed an application for SSI[1] in which she alleged her disability began on February 20, 2010. Tr. at 118. Her application was denied initially and upon reconsideration. Tr. at 134–37 and 143–44. On April 30, 2015, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Jerry W. Peace. Tr. at 26–68 (Hr'g Tr.). The ALJ issued an unfavorable decision on June 5, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 8–25. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 19, 2016. [ECF No. 1].

B.      Plaintiff's Background and Medical History

1.      Background

Plaintiff was 50 years old at the time of the hearing. Tr. at 33. She completed the ninth grade. Tr. at 34. She had no past relevant work ("PRW"). Tr. at 36. She alleges she has been unable to work since February 20, 2010. Tr. at 118.

---

[1] The record reflects that Plaintiff filed an application for SSI on January 22, 2013, but the SSI application does not appear in the record. *See* Tr. at 118. Plaintiff filed an application for Disability Insurance Benefits ("DIB") on February 7, 2013, and indicated she had filed or intended to file for SSI. *See* Tr. at 210–13. She acknowledged that she was aware that her claim for DIB would be denied because her date last insured was September 30, 2007. Tr. at 211. It does not appear that Plaintiff appealed the decision denying her DIB claim.

2. Medical History

The record contains a letter from Charles H. Hughes, M.D. ("Dr. Hughes"), dated August 18, 1992. Tr. at 487. Dr. Hughes stated Plaintiff had pins removed from her left elbow in March 1992, but that pins remained in her right knee. *Id.* He indicated Plaintiff had reduced ROM to flexion and extension of her right knee. *Id.* He stated Plaintiff was released to activities as tolerated, but would likely develop premature arthritis in her right knee and left elbow. *Id.* He indicated Plaintiff should avoid excessive bending, stooping, and kneeing with her right knee. *Id.*

On October 12, 2006, Plaintiff underwent open reduction and internal fixation ("ORIF") of her left distal fibula and placement of a syndesmosis screw, after having sustained a left ankle fracture. Tr. at 488–90.

Plaintiff's recovery was complicated by a left bimalleolar malunion. Tr. at 496. Her physicians discussed working up possible infectious sources and performing hardware removal on the lateral side. Tr. at 496–504. They indicated they did not think that Plaintiff's ankle could be reconstructed to put the talus back under the plafond. *Id.* They informed Plaintiff that they would allow her to engage in activity as tolerated after removing the hardware, but that they would recommend ankle fusion if her pain did not resolve. *Id.* Plaintiff declined to proceed with hardware removal and surgery and opted to use a 3-D walker boot, attend physical therapy, and take anti-inflammatory and pain medications. *Id.*

Plaintiff presented to the emergency room ("ER") at Baptist Easley Hospital ("BEH"), on March 27, 2009, after having been assaulted. Tr. at 357. An x-ray of her left

hand showed soft tissue swelling and osteoarthritic changes, but no evidence of acute bony trauma. Tr. at 360. An x-ray of her right hand revealed a probable acute fracture of her right ulna styloid, a possible acute fracture of her right fifth metacarpal, and osteoarthritic changes. Tr. at 362. An x-ray of Plaintiff's right humerus showed mild osteoarthritic changes, but no acute body abnormalities. Tr. at 364.

Plaintiff again presented to the ER at BEH on November 2, 2009. Tr. at 367. She reported she twisted her left ankle. *Id.* The attending physician noted tenderness and swelling in Plaintiff's left medial malleolus. Tr. at 368. X-rays indicated chronic changes, but no acute abnormality. *Id.* The provider diagnosed a left ankle sprain and fitted Plaintiff with a controlled ankle motion ("CAM") walker boot. *Id.*

Plaintiff followed up in the ER at BEH on November 10, 2009, for left ankle pain and swelling. Tr. at 372. She stated she was unable to follow up with an orthopedist because she could not afford to pay an up-front fee of $200. *Id.* The attending physician observed that Plaintiff's left ankle range of motion ("ROM") was restricted by pain and that Plaintiff was using a CAM walker. Tr. at 373. He referred Plaintiff to William Roberson, M.D. *Id.*

Plaintiff attended five physical therapy sessions in November and December 2009. Tr. at 324–34. On December 8, 2009, the physical therapist noted that Plaintiff's left ankle strength and ROM were improving, but that she continued to require a cane and to demonstrate tenderness to touch, mild swelling, and decreased strength. Tr. at 324.

Plaintiff next presented to the ER at EBH on January 28, 2010, after having twisted her left ankle. Tr. at 375. She reported pain and swelling. *Id.* The attending

physician observed Plaintiff to have restricted ROM and swelling and tenderness over her left medial malleolus. Tr. at 376. An x-ray showed no acute bony injuries, but evidence of fixation from a prior fracture and significant degenerative changes, including joint space narrowing, subchondral bony sclerosis, and cyst formation on both sides of the ankle joint. Tr. at 377. The physician diagnosed a left ankle sprain and instructed Plaintiff to follow up with her primary care provider. Tr. at 376.

Plaintiff presented to Wesley Grayson Lackey, M.D. ("Dr. Lackey"), at the Greenville Hospital System's Orthopedic Fracture Clinic on June 18, 2010. Tr. at 338. Dr. Lackey noted that Plaintiff had a history of ORIF of a left ankle fracture with syndesmotic fixation in 2006. *Id.* He stated she had subsequently developed a tibiofibular synostosis and post-traumatic arthritis with valgus tilt of the talus. *Id.* He indicated Plaintiff was "pretty much doing just fine" until she twisted her ankle three weeks prior. *Id.* Plaintiff reported increased swelling in her left ankle and was ambulating with a cane. *Id.* Dr. Lackey observed swelling, valgus alignment, too many toes sign, limited ROM, decreased dorsiflexion, and decreased plantar flexion. *Id.* He indicated x-rays of Plaintiff's left ankle showed tibiofibular synostosis, and valgus tilt of the talus with a lateral subchondral cyst secondary to degenerative changes. *Id.* He assessed post-traumatic arthritis of the left ankle with possible acute ankle sprain versus acute on chronic pain. *Id.* He advised Plaintiff of a variety of treatment options that included ankle fusion, Arizona ankle-foot orthosis ("AFO"), ankle joint injection, and a lace-up ankle brace. *Id.* Plaintiff declined all options other than the lace-up ankle brace. *Id.* Dr. Lackey advised her to rest, ice, and elevate her foot until she improved to her baseline. *Id.*

Plaintiff reported she had not been working and requested a referral to physical therapy for a work evaluation score. Tr. at 339.

Plaintiff presented to the ER at BEH on August 30, 2010, for left ankle pain and swelling. Tr. at 380. She stated her pain was exacerbated by movement and bearing weight. *Id.* An x-ray showed severe osteoarthritic changes in Plaintiff's left ankle joint. Tr. at 383. The attending physician advised Plaintiff to follow up with the Greenville Orthopedic Clinic within two days, to avoid bearing weight, and to continue her previous medications. Tr. at 381.

On September 19, 2010, Plaintiff presented to the ER at BEH. Tr. at 386. She reported right hip pain, after having sustained a fall. *Id.* The attending physician observed that Plaintiff's right hip was tender, but that she had no swelling, erythema, or ecchymosis and that her ROM was unrestricted. Tr. at 387. He diagnosed a hip contusion, prescribed Vicodin and a Medrol Dosepak, and advised Plaintiff to follow up with her primary care physician. *Id.*

Plaintiff complained of left ankle pain and indicated she was "retaining a lot of fluid" on December 8, 2010. Tr. at 344. Her provider at Samaritan Health Clinic ("SHC") observed Plaintiff to have 1+ pitting edema and to have lost 15 pounds since her last visit. *Id.*

Plaintiff followed up at SHC and reported right heel pain on January 26, 2011. Tr. at 343. She stated the pain was worse upon rising and improved after she ambulated for several minutes. *Id.* Kathy Elmore, NP-C ("Ms. Elmore") referred Plaintiff for an x-ray of her right foot. *Id.*

Plaintiff presented to a provider at SHC on February 28, 2011. Tr. at 342. An x-ray of her right foot showed an old fracture at her fifth metatarsal, metal foreign bodies that were compatible with her report of having stepped on a needle as a child, and a heel spur. Tr. at 346. The medical provider offered Plaintiff a steroid injection, but she declined it. Tr. at 342. He advised Plaintiff to continue use of Naproxen, to get heel spur shoe inserts, to soak her foot in hot water, and to lose weight. *Id.*

On April 24, 2011, Plaintiff presented to the ER at BEH for pain and swelling in her feet. Tr. at 394. The attending physician observed tenderness and swelling throughout Plaintiff's bilateral ankles and feet, but noted she had normal ROM. Tr. at 395. He prescribed Vicodin and advised Plaintiff to follow up with her primary care provider. *Id.*

Plaintiff presented to Roland Knight, M.D. ("Dr. Knight"), for a comprehensive orthopedic consultative examination on June 22, 2011. Tr. at 398–403. She reported a history of left ankle bimalleolar fracture with ORIF that resulted in ankle swelling, restricted ROM, and continued pain with walking; right knee and left elbow injuries that required surgical intervention and resulted in intermittent stiffness, pain, and catching of the knee and mildly restricted ROM of the elbow; loss of strength in the left hand with numbness in the left ring and little fingers and distal forearm; occasional right midfoot sensitivity; intermittent pain, stiffness, and soreness in her lower back; and depression. Tr. at 398–99. She reported crying and suicidal thoughts, but denied having attempted suicide. Tr. at 399. Dr. Knight observed Plaintiff to be 5'7" tall and to weigh 230 pounds. *Id.* He noted Plaintiff was wearing a CAM boot walker on her left ankle and using a cane. *Id.* He observed some atrophy of the intrinsic muscles in Plaintiff's left hand and

weakness of pinch, but noted her grip power was normal. *Id.* He found no localized sensitivity in Plaintiff's hands. *Id.* Plaintiff demonstrated normal ROM of her lumbar spine. *Id.* A straight-leg raising ("SLR") test was negative, and Plaintiff had no spasms and normal reflexes. *Id.* Dr. Knight indicated Plaintiff's left elbow ROM was mildly restricted in extension and flexion.[2] *Id.* Plaintiff demonstrated reduced dorsiflexion and plantar flexion in her left ankle[3], but normal ROM in her hips, knees, and other lower extremity joints. Tr. at 400. She was able to walk on her heels, but was unable to walk on her toes or to fully stoop. *Id.* Dr. Knight observed that Plaintiff limped on her left lower extremity. *Id.* He interpreted x-rays of Plaintiff's left ankle to show a valgus deformity of the tibiotalar joint, sinostosis between the distal fibula and tibia, a lateral fibular plate, multiple screws with intact hardware, irregular articular surfaces of the distal tibia and talus, narrowed joint space, and increased space between the medial malleolus and the medial border of the talus. *Id.* His impressions were healed distal tibiofibular fractures with internal fixation and posttraumatic arthritis of the tibiotalar joint. *Id.* He diagnosed posttraumatic contracture of the left ankle and left elbow; intrinsic weakness and numbness of the left hand, secondary to ulna stretch or strain; questionable right knee early posttraumatic arthritis; obesity; and depression. *Id.* He stated it was necessary that Plaintiff use a cane and a CAM walker to provide comfort and improve her gait. *Id.* He observed that Plaintiff was tearful during parts of the examination. Tr. at 401.

---

[2] Dr. Knight indicated Plaintiff's elbow flexion was reduced to 145 degrees, with 150 degrees being normal, and her elbow extension was reduced to –20 degrees with zero degrees being normal. Tr. at 402.

[3] Dr. Knight observed Plaintiff's left ankle dorsiflexion to be five degrees, with 20 degrees being normal, and her left ankle plantar flexion to be 30 degrees, with 40 degrees being normal. Tr. at 402.

Plaintiff presented to Robin L. Moody, Ph. D., LPC ("Dr. Moody"), for a consultative mental status examination on July 19, 2011. Tr. at 416–18. She endorsed symptoms of depression that included depressed mood, fatigue, weight gain, insomnia, withdrawal, loss of interest in pleasurable activities and socialization, and difficulty concentrating. Tr. at 416. She denied suicidal or homicidal ideations, delusions, and hallucinations. *Id.* She reported abilities to perform light household chores, prepare meals, shop alone, manage her funds, and bathe and dress herself. *Id.* She indicated she had last worked in 2006. Tr. at 417. She reported rare use of alcohol and indicated she had not used illegal drugs since she completed an inpatient treatment program more than five years prior. *Id.*

Dr. Moody observed that Plaintiff ambulated slowly with a cane. *Id.* She indicated Plaintiff appeared oriented; did not display any unusual mannerisms; was able to answer all questions to the best of her ability; had a normal affect; and described her mood as anxious. *Id.* Dr. Moody noted Plaintiff had logical and goal-directed thought processes and a cooperative attitude. *Id.* She stated Plaintiff appeared to be of average intelligence, had intact memory, and had slight impaired concentration. *Id.* Plaintiff scored 27/30 points on the Mini-Mental State Examination ("MMSE") and missed two items for delayed recall. *Id.* Dr. Moody diagnosed recurrent, moderate major depressive disorder; history of physical abuse; and polysubstance dependence in sustained full remission. Tr. at 418. She stated Plaintiff could complete chores, prepare meals, shop alone, spend time with friends, manage funds, and maintain family relationships. Tr. at 417. She indicated it was possible that Plaintiff "may be exaggerating her symptoms." *Id.*

On August 8, 2011, state agency consultant Janet Boland, Ph. D. ("Dr. Boland"), reviewed the evidence and completed a psychiatric review technique form ("PRTF"). Tr. at 81–94. She considered Listing 12.04 for affective disorders and 12.09 for substance addiction disorders. Tr. at 81. She found that Plaintiff had mild restriction of activities of daily living ("ADLs"), mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. at 91. Dr. Boland also completed a mental residual functional capacity ("RFC") assessment. Tr. at 95–98. She found that Plaintiff was moderately limited with respect to her abilities to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and interact appropriately with the general public. *Id.*

State agency medical consultant William Hopkins, M.D. ("Dr. Hopkins"), completed a physical RFC assessment on August 11, 2011, and found Plaintiff to have the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently stoop, reach with the left upper extremity, and perform fine and gross manipulation with the left hand; occasionally climb ramps and stairs, balance, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and avoid concentrated exposure to hazards. Tr. at 99–106.

On January 9, 2012, Norma L. Cano, FNP-C ("Ms. Cano"), observed Plaintiff to have 1+ pitting edema to her bilateral lower extremities. Tr. at 451. She advised Plaintiff to use Thrombo-Embolic Deterrent ("TED") hose, change her diet, stop smoking, and lose weight. *Id.* On February 9, 2012, Ms. Cano observed that Plaintiff's edema had improved with use of TED hose. Tr. at 450.

On June 6, 2012, an x-ray of Plaintiff's left ankle showed postoperative and advanced arthritic changes to the left ankle and increased soft tissue swelling. Tr. at 439.

On June 14, 2012, Plaintiff reported some improvement in her pain on an increased dose of Mobic. Tr. at 448. Ms. Cano assessed bilateral ankle pain, but noted Plaintiff had no swelling and full ROM in her extremities. *Id.*

On September 12, 2012, Ms. Cano noted that Plaintiff's left lower extremity might be slightly more discolored than her right lower extremity. Tr. at 447. She advised Plaintiff to increase her activity, decrease her weight, stop smoking, and wear TED hose daily. *Id.*

On January 30, 2013, Plaintiff reported that Mobic was no longer addressing her symptoms. Tr. at 443. She reported worsening daily joint pain that prevented her from being active. *Id.* She indicated she used a cane for ambulation. *Id.* Ms. Cano assessed joint pain in the bilateral knees and left ankle, gastroesophageal reflux disease ("GERD"), chronic pain, and use of a cane/assistive device. *Id.* She discontinued Mobic and prescribed Celebrex. *Id.*

On May 28, 2013, Plaintiff presented to Alan Peabody, M.D. ("Dr. Peabody"), for a consultative examination. Tr. at 465–67. Plaintiff reported left ankle pain with a history

of fracture and surgical intervention; intermittent right knee pain with a history of fracture; intermittent left elbow pain and left hand weakness and numbness with a history of left elbow fracture; hip pain, and depression. Tr. at 465. Dr. Peabody observed Plaintiff to be moderately obese and "in some distress with pain in her left foot and ankle." Tr. at 466. He stated Plaintiff was wearing a brace on her left ankle and using a cane for balance. *Id.* He noted Plaintiff had 2+ edema in her left ankle and was tender to palpation. *Id.* He stated Plaintiff was only able to extend and flex her left foot to about 20 degrees. *Id.* He indicated she had "virtually no lateral motion of the foot." *Id.* He observed Plaintiff to have well-healed scars over her right knee and left elbow. Tr. at 467. He noted atrophy of the interosseous muscle in Plaintiff's left hand and particularly in her fourth and fifth digits. *Id.* He stated Plaintiff demonstrated full ROM of her upper extremities, normal grip strength on the right, and normal grip strength in the first and second fingers on the left. *Id.* He indicated Plaintiff could perform normal fine motor movements, except with the fourth and fifth fingers of her left hand. *Id.* He described Plaintiff's gait as "somewhat [of a] hobble because of her stiff ankle." *Id.* He indicated she had marked motor weakness in the third, fourth, and fifth fingers of her left hand and was unable to squat because of her ankle. *Id.* His impressions were fracture of the right knee, motor vehicle accident with fractures of the left elbow and ankle, probable ulnar damage to the left arm, posttraumatic arthritis in the bilateral ankles, and exogenous obesity. *Id.* An x-ray of Plaintiff's left ankle showed severe post-traumatic degenerative osteoarthritis at the level of the ankle with fixation of distal long bone fractures. Tr. at

462. An x-ray of Plaintiff's right knee indicated three-compartment degenerative osteoarthritis and a healed fracture of the patella with fractured cerclage wire. Tr. at 463.

Debra C. Price, Ph. D. ("Dr. Price"), a state agency consultant, completed a PRTF on June 21, 2013. Tr. at 111–12. She considered Listing 12.04 for affective disorders and found that Plaintiff had mild restriction of ADLs, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Tr. at 111. Another state agency consultant Craig Horn, Ph. D. ("Dr. Horn"), indicated the same degree of mental limitation on August 20, 2013. Tr. at 125–26.

State agency medical consultant Ted Roper, M.D. ("Dr. Roper"), reviewed the evidence and completed a physical RFC assessment on June 25, 2013. Tr. at 112–15. He found that Plaintiff had the following limitations: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; never crawl or climb ladders, ropes, or scaffolds; frequently finger and handle with the left upper extremity; and avoid concentrated exposure to hazards. *Id.* Another state agency medical consultant, Dale Van Slooten, M.D. ("Dr. Van Slooten"), reviewed the record and assessed the same physical RFC on August 21, 2013. Tr. at 126–29.

On August 21, 2013, Plaintiff complained of a three-week history of right hip pain that was accompanied by a burning sensation and a popping sound. Tr. at 483. Ms. Cano noted that Plaintiff had used a cane for support for "a long time" as a result of ankle injury and pain. *Id.* She stated Plaintiff had limited ROM in her left ankle and

overcompensated with her right leg when she walked. *Id.* She assessed right hip pain and referred Plaintiff for an x-ray. *Id.*

On September 11, 2013, Plaintiff followed up with Ms. Cano to review the x-ray report. Tr. at 480. Ms. Cano indicated the x-ray was negative. *Id.* She prescribed 100 milligrams of Neurontin twice daily and advised Plaintiff to lose weight, engage in stretching exercises, and walk as tolerated. *Id.*

Plaintiff reported severe, burning right hip pain on October 31, 2013. Tr. at 479. Ms. Cano observed Plaintiff to be tearful, to have positive tenderness, to ambulate with a limp, and to use a cane. *Id.* She referred Plaintiff for an MRI of her right hip and increased her dosage of Neurontin to 300 milligrams twice a day. *Id.*

On November 19, 2013, magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine showed mild multilevel degenerative disc and facet changes at multiple levels. Tr. at 468.

Plaintiff reported chronic low back pain that radiated to her right hip on December 11, 2013. Tr. at 477. She indicated she had noticed some improvement in her pain since her dosage of Neurontin had been increased. *Id.* Ms. Cano indicated Plaintiff might benefit from physical therapy and referred her for an initial evaluation. *Id.* She advised Plaintiff to stretch before exercising and to work on losing weight. *Id.*

On January 10, 2014, Plaintiff reported she had been unable to attend the physical therapy consultation because her mother was undergoing cancer treatment. Tr. at 476. She requested that she be referred again. *Id.* Ms. Cano assessed chronic back pain and rewrote the referral for a physical therapy evaluation. *Id.*

On April 9, 2014, Plaintiff reported continued pain, after having strained her right sciatic nerve three weeks prior. Tr. at 474. She indicated physical therapy had been helpful. *Id.* Ms. Cano instructed Plaintiff to continue taking Celebrex and Baclofen and administered a Depo Medrol injection. *Id.*

On September 24, 2014, Plaintiff requested a disabled placard for her vehicle. Tr. at 471. Ms. Cano indicated Plaintiff had been using a cane to ambulate for four years. *Id.* She noted Plaintiff was walking and engaging in stretching exercises. *Id.*

On November 8, 2014, Plaintiff visited the ER at BEH. Tr. at 531. She reported that her hand had started to swell at night during the prior month and that she experienced burning and numbness in her right index finger. *Id.* The attending physician observed Plaintiff to have full ROM in her right wrist and fingers; mild swelling in her right second and third metacarpophalangeal ("MCP") joints, and positive Tinel's sign. Tr. at 542. He assessed osteoarthritis and carpal tunnel syndrome of the right hand. *Id.*

Plaintiff presented to the ER at BEH on January 5, 2015, for low back pain. Tr. at 511. She stated she noticed the pain after having lifted heavy boxes one week prior. *Id.* The attending physician observed Plaintiff to have diffuse tenderness in her lumbar spine and a positive SLR test at 15 degrees, but to have normal ROM and no swelling ecchymosis, laceration, or abrasion. Tr. at 520. He diagnosed back pain, lumbar strain, and sciatica and prescribed Tylenol with Codeine, Prednisone, and Flexeril. *Id.*

On January 28, 2015, an x-ray of Plaintiff's lumbar spine showed mild narrowing of the L4-5 disc space with anterior spurring at multiple levels. Tr. at 553. It indicated no

fractures or destructive lesions and normal posterior facet and sacroiliac joints. *Id.* X-rays

of Plaintiff's bilateral hips showed normal findings. Tr. at 554.

  C.  The Administrative Proceedings

    1.  The Administrative Hearing

      a.  Plaintiff's Testimony

At the hearing on April 30, 2015, Plaintiff testified she lived with her mother in a

mobile home. Tr. at 32–33. She stated she was 5'7" tall and weighed 261 pounds. Tr. at

33. She indicated she had last worked as a line cook at Tommy's Ham House in 2006. Tr.

at 36. She stated she had left the job after having fractured her ankle. *Id.*

Plaintiff testified she was unable to work because of difficulty standing. Tr. at 37.

She endorsed a history of left ankle and left elbow surgeries. Tr. at 39. She stated she was

unable to walk "any kind of distance" and had difficulty bearing weight on her left ankle.

Tr. at 37. She indicated she experienced swelling in her left leg. Tr. at 48. She stated she

had injured her left hand and crushed her elbow in a motor vehicle accident. Tr. at 38.

She indicated she experienced constant numbness and tingling from her left elbow

through her pinky and ring fingers. Tr. at 50. She stated she had difficulty straightening

her two small fingers. Tr. at 50. She indicated she had problems gripping and holding

items and washing dishes with her left hand. Tr. at 49–50. She testified she had pins in

her right knee and experienced stiffness in her right lower extremity. Tr. at 38. She stated

that she had developed problems with her right hip because of difficulty bearing weight

on her left side. *Id.* She confirmed that she had been diagnosed with osteoarthritis in her

right hand. Tr. at 51. She stated she experienced numbness and tingling in the hand and swelling in her knuckle. *Id.*

Plaintiff testified that she could stand for five minutes with a cane. Tr. at 44. She stated she used a cane "all the time," but she denied that it was prescribed. *Id.* She estimated she could sit for an hour. *Id.* She indicated she could walk 50 yards on a flat surface. *Id.* She stated she could lift five pounds. *Id.* She indicated she could bend "to a degree" and had difficulty squatting. Tr. at 45. She stated she was unable to get down on her knees. *Id.* She endorsed occasional difficulty breathing. *Id.* She estimated she could use her hands for five to 10 minutes at a time. Tr. at 52.

Plaintiff stated she experienced pain "[p]retty much all the time." *Id.* She testified her pain affected her abilities to concentrate and maintain focus for more than about 10 minutes at a time. Tr. at 65–66. She indicated her pain was reduced by elevating her left leg at hip level. Tr. at 47–48. She stated she wore a brace on her left ankle when she left her home. Tr. at 47. She indicated she used ice, a heating pad, Icy Hot, ace bandages, and soaked her leg in Epsom salt and hot water to reduce her pain. Tr. at 48. She testified her medicine made her dizzy, nauseated, and shaky and that she would lie down for a couple of hours after taking it. Tr. at 40. She further indicated that she experienced ringing in her ears and blurred vision as side effects of her medications. Tr. at 43. She indicated she wore a carpal tunnel brace on her right hand while sleeping. Tr. at 51.

Plaintiff stated she had served an eight-month jail sentence in 2005 for possession of methamphetamine. Tr. at 35. She indicated she had been incarcerated "a couple of times." *Id.* She stated she last drank alcohol approximately two years prior to the hearing.

Tr. at 43. She indicated she last used illegal drugs in 2005 and completed a 90-day inpatient drug abuse treatment program in 2006. Tr. at 44 and 58. She indicated she had not reported earnings for a period that she worked for her sister "cleaning apartments in Spartanburg." Tr. at 59.

Plaintiff testified that she had a driver's license and was able to drive. Tr. at 34. She indicated she performed light household chores, cleaned the bathroom, washed dishes, and did laundry. Tr. at 40–41. She stated she was able to bathe, dress, and care for her hair and makeup without assistance. Tr. at 41. She indicated she used a motorized cart when she went shopping. Tr. at 41–42. She testified she visited with family members and occasionally visited friends, but spent most of her time at home. Tr. at 42.

### b. Vocational Expert Testimony

Vocational Expert ("VE") Carroll Crawford reviewed the record and testified at the hearing. Tr. at 60–67.The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift up to 20 pounds occasionally and 10 pounds frequently; stand or walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday; never crawl or climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, crouch, and kneel; and frequently use moving machinery, be exposed to unprotected heights, and handle and finger with the left upper extremity. Tr. at 60–61. The VE testified that the hypothetical individual could perform jobs at the sedentary exertional level with the specified restrictions because of the limitation to two hours of standing and walking. Tr. at 61. The VE identified sedentary jobs with a specific vocational preparation ("SVP") of two as an addresser, *Dictionary of Occupational Titles*

("*DOT*") number 209.587-020, with 780,000 positions in the national economy and a document sorter, *DOT* number 539.485-010, with 84,000 positions in the national economy. *Id.*

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work that required she lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand or walk for approximately six hours in an eight-hour workday; sit for approximately six hours in an eight hour workday; occasionally balance, stoop, crouch, kneel, and operate foot controls with the left lower extremity; never crawl or climb ladders, ropes, scaffolds, ramps, or stairs; and frequently handle, finger, use moving machinery, and be exposed to unprotected heights. Tr. at 62. The ALJ asked if there would be jobs available for an individual with those limitations. *Id.* The VE testified that the individual could perform light work with an SVP of two as an office helper, *DOT* number 239.567-010, with 168,000 positions in the national economy; a mailroom clerk, *DOT* number 209.687-026, with 119,000 positions in the national economy; and a clerical messenger, *DOT* number 230.663-010, with 77,000 positions in the national economy. *Id.*

Plaintiff's attorney asked the VE to consider the hypothetical individual described in either of the first two questions and to further consider than the individual would have to elevate her leg at waist-level for 20% of the workday. Tr. at 63. The VE testified that the individual would be unable to perform any jobs. *Id.*

Plaintiff's attorney asked the VE to consider the restrictions in the first two hypothetical questions, but to further assume the individual would be limited to no more

than occasional use of the left hand for fine or gross manipulation. Tr. at 63. The VE asked Plaintiff's attorney to clarify which hand was dominant. *Id.* Plaintiff's attorney indicated the right hand was dominant. Tr. at 64. The VE stated the individual could likely perform the identified job if her ability to use her non-dominant hand were reduced by 20%.

Plaintiff's attorney then asked the VE to assume the individual would only be able to use the non-dominant hand for fine manipulation and gross handling for 20% of the workday. *Id.* The VE testified the individual would be unable to perform the identified jobs. *Id.*

Plaintiff's attorney asked if the individual would be able to perform the jobs identified in response to the first and second hypothetical questions if she were to require unscheduled breaks. *Id.* The VE indicated that if the unscheduled breaks totaled 30 minutes or more during an eight-hour workday, they would likely interfere with the individual's ability to perform full time work. Tr. at 64–65.

Plaintiff's attorney asked the VE to consider the restrictions in the first and second hypothetical questions, but to further assume the individual would be unable to maintain persistent concentration, persistence, and pace for two hours at a time. Tr. at 66–67. He asked how that would affect the jobs identified in response to those questions. *Id.* The VE stated the individual would be unable to perform any jobs. Tr. at 67.

2.    The ALJ's Findings

In his decision dated June 5, 2015, the ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since January 22, 2013, the application date (20 CFR 416.971 et seq.).
2. The claimant has the following severe impairments: osteoarthritis, dysfunction of major joint, and obesity (20 CFR 416.920(c)).
3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) with the following limitations: she can lift 20 pounds occasionally, 10 pounds frequently. She can stand or walk six hours in an eight-hour workday with normal breaks. She is limited to occasional left operation of foot controls. She must never climb ladders, ropes, scaffolds, ramps, or stairs. She can occasionally balance, stoop, crouch, or kneel, but must never crawl. She is further limited to frequent bilateral handling and fingering, frequent use of moving machinery, and frequent exposure to unprotected heights.
5. The claimant has no past relevant work (20 CFR 416.965).
6. The claimant was born on September 23, 1964 and was 48 years old, which is defined as a younger individual, on the date the application was filed (20 CFR 416.963).
7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).
8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).
9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).
10. The claimant has not been under a disability, as defined in the Social Security Act, since January 22, 2013, the date the application was filed (20 CFR 416.920(g)).

Tr. at 13–20.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ misinterpreted the evidence of record and failed to consider the side effects of Plaintiff's medications in assessing her credibility[4]; and

2)    the ALJ's finding that Plaintiff could perform light work is not supported by the examining physicians' observations.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged

---

[4] Plaintiff presents these as two separate arguments, but the court finds it appropriate to consider them together, as both pertain to the ALJ's assessment of Plaintiff's subjective statements.

in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's PRW to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 416.920(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Evaluation of Evidence in Assessing Credibility

The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause the alleged symptoms, but that her "statements concerning the intensity, persistence and limiting effects of those symptoms" were "not entirely credible." Tr. at 16.

Plaintiff argues the ALJ erroneously found that she worked after 2006 and based his overall conclusions on this finding. [ECF No. 12 at 3]. She maintains the ALJ impermissibly factored his unsupported conclusion regarding the work she performed into his assessment of her credibility and his weighing of the state agency examiners' opinions. *Id.* at 4–5. She contends the ALJ failed to consider the side effects from her medications in evaluating her subjective complaints and determining her RFC. *Id.* at 9–10.

The Commissioner argues the ALJ "has the exclusive responsibility for making credibility determinations." [ECF No. 13 at 9]. She maintains that the ALJ did not base his credibility assessment exclusively on his finding that Plaintiff worked after 2006. *Id.* She contends the evidence did not support Plaintiff's allegations of disabling limitations. *Id.* at 11. She claims that the evidence supported the ALJ's finding that Plaintiff had "under the table" earnings that she failed to disclose to the Social Security Administration ("SSA") in her prior reports, but that the ALJ did not find that those earnings occurred after 2006. *Id.* at 11–13. She argues that the ALJ considered Plaintiff's purported side effects from medications, but that the record contained no references to the side effects she alleged. *Id.* at 19.

Pursuant to SSR 96-7p, after finding that a claimant has a medically-determinable impairment that could reasonably be expected to produce her alleged symptoms, an ALJ should evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the restrictions they impose on her ability to do basic work activities. If the objective medical evidence does not substantiate the claimant's statements about the intensity, persistence, or limiting effects of her symptoms, the ALJ is required to consider the credibility of the statements in light of the entire case record. *Id.* The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.*

In addition to the objective medical evidence, the ALJ should consider the following factors in evaluating the credibility of a claimant's subjective statements: the claimant's ADLs; the location, duration, frequency, and intensity of her pain or other symptoms; factors that precipitate and aggravate her symptoms; the type, dosage, effectiveness, and side effects of her medications; treatment, other than medication, she receives or has received; any measures other than treatment and medications she uses or has used to relieve her pain or other symptoms; and any other relevant factors concerning her limitations and restrictions. SSR 96-7p. In *Mascio v. Colvin*, 780 F.3d 632, 639–40 (4th Cir. 2015), the court emphasized the need to compare the claimant's alleged functional limitations to the other evidence of record and indicated an ALJ should explain how he decided which of a claimant's statements to believe and which to discredit.

The ALJ must cite specific reasons to support his credibility finding and his reasons must be consistent with the evidence in the case record. SSR 96-7p. His decision must clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.* The Fourth Circuit has stressed that an ALJ's decision must "build an accurate and logical bridge from the evidence" to the conclusion regarding the claimant's credibility. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016), citing *Clifford v. Apfel*, 227 F.3d 872 (7th Cir. 2000).

In view of the forgoing authority, the court considers Plaintiff's specific allegations that the ALJ erred in considering her unreported earnings and in failing to consider the side effects of her medications, as well as the Commissioner's argument that the ALJ provided other valid reasons to support his credibility determination.

a.      Side Effects of Medications

In *Mascio*, 780 F.3d at 639–40, the Fourth Circuit stressed that an ALJ is required to compare a claimant's alleged functional limitations to the evidence and to explain his reasons for accepting or rejecting them. Both 20 C.F.R. § 416.929(c)(3)(iv) and SSR 96-7p specify that side effects of medications are among the evidence that ALJs are required to consider in evaluating the intensity and persistence of a claimant's symptoms and the extent to which they limit her capacity for work.

The ALJ noted that Plaintiff testified that her ability to work was compromised by side effects from her medications that included dizziness, nausea, blurred vision, and ringing in her ears. Tr. at 16. However, he did not explain whether he credited or rejected Plaintiff's allegations regarding the side effects of her medications. Thus, the ALJ's credibility finding is not fully supported by the provisions of 20 C.F.R. § 416.929(c)(3)(iv) and SSR 96-7p and does not comply with the Fourth Circuit's instruction in *Mascio*.

The court rejects the Commissioner's argument that the ALJ should not have been required to address Plaintiff's statements regarding the side effects of her medications because the medical records did not reflect her complaints.[7] The court cannot accept an explanation for the ALJ's omission that was not offered by the ALJ. "[T]he principles of agency law limit this Court's ability to affirm based on post hoc rationalizations from the Commissioner's lawyers . . . '[R]egardless [of] whether there is enough evidence in the

_____

[7] Although the medical records do not reflect Plaintiff's complaints regarding side effects of her medications, these complaints are reflected in several reports that Plaintiff submitted to the agency. *See* Tr. at 256, 275, and 298.

record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine our review to the reasons supplied by the ALJ.'" *Robinson ex rel. M.R. v. Comm'r of Soc. Sec.*, No. 0:07-3521-GRA, 2009 WL 708267, at *12 (D.S.C. 2009) citing *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).

b.     Unreported Earnings

Although the ALJ did not make a specific finding that Plaintiff engaged in work activity after 2006, his statements strongly suggest such a finding. The ALJ wrote the following that pertained to Plaintiff's work activity: "The claimant testified that she has not worked since 2006, though she stated that she worked under the table cleaning houses for her sister." Tr. at 13. He later wrote:

> Finally, the record demonstrates that in 2010 the claimant requested a work evaluation for overall disability score as she had not been working, though her earnings records indicate that she had not worked since 2006 (B4D; B5D; B6F/9). The claimant testified that she worked "under the table" for a number of years cleaning houses for her sister. This fact further impacts the claimant's credibility.

Tr. at 17. The ALJ also considered Plaintiff's "testimony that she was working under the table cleaning houses for several years" in giving little weight to the state agency medical consultants' opinions. Tr. at 18.

Pursuant to SSR 96-7p, "[t]he finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility." Despite using her work activity to support a decision to find Plaintiff's statements less credible, the ALJ cited no evidence to support a finding that Plaintiff engaged in work activity after 2006. Furthermore, the court's review of the record has

29

yielded no evidence to support such a finding.  In the absence of any evidence in the record to support a finding that Plaintiff worked after 2006, *it appears the finding is based on the ALJ's intuitive notion and unsupported* under the provisions of SSR 96-7p.

Even if the court were to accept the Commissioner's argument that the ALJ did not find that Plaintiff engaged in work activity after 2006, but rather discounted the credibility of her statements based on her alleged failure to report her prior earnings, the ALJ cited no reason for relying on a history of unreported earnings to discount Plaintiff's statements regarding the functional effects of her impairments during the relevant period.[8] Although 20 C.F.R. § 416.929(c)(3) and SSR 96-7p indicate that the relevant evidence to be considered in evaluating the credibility of a claimant's statements includes information about the claimant's prior work record and efforts to work, a claimant's prior work record is relevant under these provisions to "[e]valuat[e] the intensity and persistence" of the claimant's symptoms and "determin[e] the extent to which [her] symptoms limit [her] capacity for work." SSR 96-7p. The ALJ's decision fails to build "an accurate and logical bridge" between Plaintiff's failure to report past earnings and a

_____

[8] The relevant period in this case ran from Plaintiff's filing date of January 22, 2013, through June 5, 2015, the date of the ALJ's decision. *See* 20 C.F.R. § 416.305(a) (providing that an individual is not eligible for SSI for any period prior to the date on which the application was filed). Had the record contained evidence that Plaintiff was working during the relevant period, such evidence would be pertinent to the ALJ's evaluation of her statements regarding the functional effects of her impairments. For example, if the ALJ had pointed to evidence in the record that supported a finding that Plaintiff was cleaning houses for her sister during the relevant period, such work activity would appear to be inconsistent with her report that she could stand for five minutes, walk 50 yards, lift five pounds, use her hands for five to 10 minutes, and had difficulty bending, squatting, and being on her knees. *See* Tr. at 44–45 and 52. However, the ALJ pointed to no such evidence and made a specific finding of fact that Plaintiff had not engaged in substantial gainful activity during the relevant period. *See* Tr. at 13.

conclusion that her subjective reports of the functional effects of her impairments were inaccurate.[9] *See Monroe*, 826 F.3d at 189. Thus, substantial evidence does not support the ALJs decision to impugn Plaintiff's statements regarding the functional effects of her impairments because of her prior unreported earnings.

The Commissioner appears to argue that any error the ALJ might have made in considering Plaintiff's prior unreported earnings was harmless because he cited multiple additional reasons to support his decision to discount the credibility of Plaintiff's statements. [ECF No. 13 at 9–11]. The ALJ cited the following in addition to Plaintiff's unreported prior work: her abilities to live independently and to care for herself, treating and consultative medical providers' reports, her indication that medication helped her pain, an injury that occurred when she was helping her mother put away Christmas decorations, a negative x-ray of her hip, and her decision to proceed with conservative treatment. *See* Tr. at 16–18. While the Commissioner directs the court to other reasons the ALJ offered to support his findings, the court is constrained to find that the ALJ's error in considering Plaintiff's prior unreported earning was not harmless in that it affected his consideration of the medical opinion evidence and his assessment of Plaintiff's RFC, as discussed below.

---

[9] The SSA recently published SSR 16-3p, 2016 WL 1119029 (2016), which supersedes SSR 96-7p. Because the ALJ decided this case prior to March 16, 2016, the effective date of SSR 16-3p, it was not the controlling SSR at the time the ALJ issued the decision. However, the court has considered SSR 16-3p's language that it is intended to "clarify that subjective symptom evaluation is not an examination of the individual's character" and that its intent is to "more closely follow [the] regulatory language," which "do[es] not use" the term "credibility."

2. Ability to Perform Light Work

Plaintiff argues the ALJ's finding that she could perform light work was not supported by the opinions of any examining physicians. [ECF No. 12 at 5]. She maintains that the limitations identified by Dr. Knight prevented her from performing light work. *Id.* at 6. She contends that three non-examining evaluators limited her to sedentary work. *Id.* at 6. She claims the ALJ erred in finding that Dr. Peabody's evaluation was consistent with a finding that she could perform light work. *Id.* at 6–7. Finally, she contends that Medical-Vocational Rule 201.09[10] would support a finding that she was disabled as of September 23, 2014—her fiftieth birthday. *Id.* at 9.

The Commissioner argues the ALJ correctly weighed the opinion evidence and that Plaintiff is asking the court to reweigh it. [ECF No. 13 at 13]. She maintains that the ALJ is not required to accept any medical opinion of record and must choose among conflicting opinions. *Id.* at 14–15. She contends the ALJ considered all of Plaintiff's credibly-established limitations in assessing her RFC. *Id.* at 17–18.

A claimant's RFC represents the most she can still do despite her limitations. 20 C.F.R. § 416.945(a). It must be based on all the relevant evidence in the case record and should account for all of the claimant's medically-determinable impairments. *Id.*

In determining a claimant's RFC, an ALJ must carefully consider medical source opinions of record. SSR 96-5p. He should evaluate and weigh those opinions based on the factors in 20 C.F.R. § 416.927(c), which include (1) the examining relationship

---

[10] Plaintiff cited Medical-Vocational Rule 201.10, but because the ALJ found that she had no PRW, her argument would actually direct a finding of "disabled" under Medical-Vocational Rule 201.09.

between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his or her own treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654.

The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p. The ALJ must explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* This court is generally prohibited from disturbing the ALJ's weighing of the medical opinion evidence "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam). Nevertheless, "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ found that Plaintiff had the RFC to perform light work that required she lift 20 pounds occasionally and 10 pounds frequently; stand or walk for six hours and sit

for six hours in an eight-hour workday with normal breaks; occasionally balance, stoop, crouch, kneel, and use her left foot to operate foot controls; never crawl or climb ladders, ropes, scaffolds, ramps, or stairs; and frequently handle and finger, use moving machinery, and be exposed to unprotected heights. Tr. at 15–16.

In view of the foregoing authority, the court has considered the ALJ's evaluation of the medical opinions of record in evaluating Plaintiff's RFC.

### a. Dr. Knight's Opinion

On June 22, 2011, Dr. Knight stated it was necessary that Plaintiff use a CAM walker and a cane to provide comfort and improve her gait. Tr. at 400. He noted Plaintiff had limited dexterity in her left hand and was "limited with long walking, long standing, stairs and squatting." Tr. at 401. He indicated Plaintiff's pain was aggravated by "weightbearing when first standing especially." *Id.* He stated Plaintiff would need a walker "[a]t times" to assist with ambulation. *Id.*

The ALJ gave little weight to Dr. Knight's opinion because he found that it was based on Plaintiff's allegations, which were inconsistent with a record that indicated she was "not as limited as she alleges (B18F/11, 33; B19F/1–2)." Tr. at 18. The exhibit the ALJ cited at B18F/11 is a January 5, 2015 record from BEH that shows Plaintiff to have a positive SLR test and diffuse tenderness in her lumbar spine, but normal musculoskeletal and back ROM, no swelling, and no neurological deficits. Tr. at 520. The exhibits he cited at B19F/1–2 are x-rays of Plaintiff's lumbar spine and hips. Tr. at 553–54. The x-ray of Plaintiff's lumbar spine showed anterior hypertrophic changes that were "of

doubtful clinical significance." Tr. at 553. The x-ray of Plaintiff's hips was normal. Tr. at 554.

As an initial matter, the ALJ's evaluation does not reflect his consideration of the supportability of Dr. Knight's opinion in his own record or his orthopedic specialization. *See* 20 C.F.R. § 416.927(c)(3), (5). Although the ALJ found that Dr. Knight's opinion was inconsistent with the record as a whole, the evidence he cited was not inconsistent with Dr. Knight's objective findings or the restrictions he indicated. Dr. Knight's opinion addressed Plaintiff's difficulty standing, walking, and using her left hand as a result of impairments to her left ankle, right knee, and left elbow. *See* Tr. at 399–401. He did not indicate Plaintiff was limited by back or right hip pain and his observations were similar to those of the ER physicians with respect to Plaintiff's back and right hip. *Compare* Tr. at 399–400, *with* Tr. at 520 and 553–54. Therefore, substantial evidence does not support the ALJ's decision to give little weight to Dr. Knight's opinion, and the ALJ's finding that Plaintiff had the RFC to stand or walk for six hours in an eight-hour workday cannot be reconciled with Dr. Knight's opinion.

b.    State Agency Consultants' Opinions

On August 11, 2011, Dr. Hopkins found that Plaintiff had the RFC to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for at least two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently stoop, reach with the left upper extremity, and perform fine and gross manipulation with the left hand; occasionally climb ramps and stairs, balance, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and avoid concentrated

exposure to hazards. Tr. at 99–106. On June 25 and August 21, 2013, Drs. Roper and Van Slooten assessed Plaintiff to have the same RFC that Dr. Hopkins had assessed, except that they limited Plaintiff to occasional stooping and no crawling and assessed no particular restriction with respect to her ability to lift overhead. *Compare* Tr. at 102, *with* Tr. at 114 and 128.

The ALJ gave little weight to the state agency medical consultants' opinions because evidence received at the hearing level, including records and reports from Easley Baptist Hospital and Plaintiff's testimony as to her unreported work cleaning houses, "demonstrate[d] that the claimant's allegations [were] only minimally credible (B3A; B4A; B5A; B8A)."[11] Tr. at 18.

As discussed above, the evidence does not support a finding that Plaintiff engaged in unreported work cleaning houses during the relevant period. The ALJ specifically found that Plaintiff had not engaged in substantial gainful activity since January 22, 2013. Tr. at 13. Thus, even if we are to put aside Dr. Hopkins's opinion because it was rendered prior to the relevant period, we are left with opinions from two state agency physicians who indicated Plaintiff had a maximum RFC to stand and walk for two hours in an eight-hour workday during a period that the ALJ has affirmatively found that Plaintiff did not engage in substantial gainful activity. Therefore, the ALJ's decision to give little weight to the opinions of Drs. Roper and Van Slooten based on Plaintiff's unreported work

---

[11] The exhibits the ALJ cited in parentheses are Dr. Boland's mental RFC assessment, Dr. Hopkins's physical RFC assessment, Dr. Roper's disability determination explanation, and Dr. Van Slooten's disability determination explanation. *See* Tr. 95–98, 99–106, 107–17, and 120–31.

activity is unsupported by his earlier finding that Plaintiff had not engaged in substantial gainful activity during the relevant period.

In addition, it is not evident from the ALJ's decision that he considered the factors in 20 C.F.R. § 416.927(c) in evaluating the state agency consultants' opinions. Because the state agency physicians were not treating or examining physicians, the only factors in 20 C.F.R. § 416.927(c) that would be applicable to consideration of their opinions would be the consistency and specialization factors. The decision reflects no consideration of that fact that Drs. Hopkins, Roper, and Van Slooten generally indicated Plaintiff to have the same RFC. *Compare* Tr. at 99–106, *with* Tr. at 112–15 and Tr. at 126–29. It also shows no comparison of their findings with the objective evidence in the record. Therefore, substantial evidence does not support the ALJ's decision to accord little weight to the state agency consultants' opinions. Furthermore, because the ALJ has cited no valid reason for discounting opinions that Plaintiff had a maximum RFC to stand and walk for two hours and finding instead that she could stand and walk for six hours during an eight-hour workday, his RFC assessment is flawed.

### c.      Dr. Peabody's Opinion

On May 28, 2013, Dr. Peabody stated Plaintiff had "a difficult time trying to walk with her various fractures and orthopedic appliances." Tr. at 467. He stated Plaintiff had "considerable pain in both knees and her left elbow" and "weakness in her left hand." *Id.* He indicated Plaintiff's situation "would probably be markedly improved if she lost considerably more weight." *Id.*

The ALJ accorded "great weight" to Dr. Peabody's opinion "as it is supported by and consistent with the overall evidence of record, including examination findings, diagnoses, treatment and prescribed medications and is incorporated into the residual functional capacity noted above (B4F/15; B10F/2–3; B18F/42)." Tr. at 18. The exhibit the ALJ cited at B4F/15 is an x-ray of Plaintiff's right hand dated March 27, 2009, that shows a likely acute fracture of the ulna styloid; a possible acute fracture of the right fifth metacarpal; and osteoarthritic changes. Tr. at 362. The exhibits the ALJ cited at B10F/2–3 include an x-ray of Plaintiff's left ankle that indicates severe post-traumatic degenerative osteoarthritis at the ankle level with fixation of distal long bone fractures and an x-ray of Plaintiff's right knee that shows a healed fracture of the patella and three-compartmental degenerative osteoarthritis. Tr. at 462–63. The exhibit the ALJ cited at B18F/42 is an x-ray of Plaintiff's right hand dated November 8, 2014, that shows old fractures of the ulnar styloid and fifth metacarpal, mild degenerative changes of the first MCP joint, and no acute bony injuries. Tr. at 551.

The ALJ stated he considered the examining relationship between Plaintiff and Dr. Peabody, the supportability of Dr. Peabody's opinion with his findings, and the consistency of his opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c)(1), (3), and (4). However, despite the ALJ's indication, it does not appear that he compared Dr. Peabody's opinion with the other opinions of record. Dr. Peabody's findings and opinion that Plaintiff had difficulty walking, pain in her bilateral knees and left elbow, and weakness in her left hand appear to be consistent with Dr. Knight's findings and opinion

and the state agency consultants' RFC findings. *Compare* Tr. at 467, *with* Tr. at 99–106, Tr. at 112–15, Tr. at 126–29, and Tr. at 398–403.

The ALJ assessed an RFC that required Plaintiff to stand and walk for six hours in an eight-hour workday. *See* Tr. at 15. This finding appears to be incongruous with the "great weight" that he accorded to Dr. Peabody's opinion that Plaintiff had considerable knee pain and difficulty walking. Furthermore, Drs. Roper and Van Slooten indicated Dr. Peabody's opinion was among the evidence that they considered in finding Plaintiff had a maximum RFC to stand and walk for two hours in an eight-hour workday. Tr. at 108 and 122. In the absence of a reasonable explanation from the ALJ as to how Dr. Peabody's opinion was more consistent with the assessed RFC than with the two-hour standing and walking limitation, the court cannot find that substantial evidence supports his RFC assessment.

Medical-Vocational Guideline 201.09 directs a finding that a claimant is disabled where the claimant is limited to work at the sedentary exertional level; is closely approaching advanced age; has a limited or less than high school education; and has no PRW or a history of unskilled work. 20 C.F.R. Part 404, Subpart P, App'x 2, § 201.09. The record contains three medical opinions that specifically restrict Plaintiff to standing and walking for no more than two hours in an eight-hour workday. Tr. at 100, 113, and 127. The VE testified that an individual who was restricted to standing and walking for two hours in an eight-hour workday would be limited to sedentary work. Tr. at 61. Plaintiff was 50 years old at the time of the hearing; had less than a high school education; and had no PRW. Tr. at 33, 34, and 36. In light of this evidence, the court

finds significant merit in Plaintiff's argument that Medical-Vocational Rule 201.09 would direct a finding of disability as of her fiftieth birthday. However, the undersigned is disinclined to remand the case for an award of benefits as of Plaintiff's fiftieth birthday because proper evaluation of the evidence might support an earlier entitlement to benefits.

III.     Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

*Shiva V. Hodges*

May 10, 2017                                      Shiva V. Hodges
Columbia, South Carolina                United States Magistrate Judge